UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| United States of America, | File No. 25-CR-256 (JMB/EMB) |
| Plaintiff, | |
| v. | |
| Amiir Mawlid Ali, | ORDER ADOPTING REPORT AND RECOMMENDATION |
| Defendant. | |

---

This matter is before the Court on the Report and Recommendation (R&R) of Magistrate Judge Elsa M. Bullard dated October 27, 2025.  (Doc. No. 52.)  The R&R recommends denial of Ali's Motion to Dismiss the Indictment (Doc. No. 25) and Motion to Suppress Fruits of Unlawful Arrest and Search and Seizure (Doc. No. 31).  Ali filed Objections to the recommendation to deny the Motion to Suppress (Doc. No. 53.)  The Government filed a Response.  (Doc. No. 54.)  For the reasons discussed below, the Court overrules Ali's Objections, adopts the R&R, and denies Ali's Motion.

## BACKGROUND

The factual background for this matter is set forth in the R&R and is incorporated here by reference.  Because the R&R provides a detailed history, the Court only briefly summarizes it here.

In June 2025, Minneapolis Police Officers Mohamud Jama and Matt Olson stopped a car that they observed with "heavy window tint" that made incomplete stops at two different stop signs.  (Doc. No. 49 [hereinafter, "Tr."] at 21.)  Jama approached the driver

1

and asked for identification. (Gov't Ex. 2 at 0:57.) He then asked the passengers for their IDs, as well. (*Id.* at 1:20.) Three seconds later, he asked, "Any weapons in the car?" (*Id.* at 1:23.) Jama later testified that before answering "no" to his question, "[t]here was a slight delay of hesitation to answer the question." (Tr. 31.) At the scene, Olson similarly noted that the car occupants were "pretty slow to respond" to Jama's question. (Gov't Ex. 3 at 1:29.) Based on the car occupants' hesitation to answer his question about weapons, in addition to other factors noted in the R&R (*see* R&R at 5), Jama removed all three individuals from the vehicle to conduct a weapons sweep. (Tr. 35.) When he removed the driver, Jama asked again whether there were any guns in the car, and this time, the driver provided a different response, stating, "I don't know." (*Id.* at 38.) Then, as Jama was escorting Ali from the front passenger seat to the squad vehicle, Ali "tried to run." (*Id.* at 40; Gov't Ex. 2 at 10:42; Gov't Ex. 3 at 10:43.) the video from the body worn camera of the incident shows Jama walking with Ali toward the squad car with his hand on Ali's arm. (Gov. Ex. 3 at 10:39.) As they walk, the video depicts Jama explaining that he will not use handcuffs so long as Ali remains cooperative. (Gov't Ex. 2 at 10:39.) Then, as they both approach the door to the back seat of the squad car, Ali momentarily begins to slow and turns slightly toward the door of the vehicle before sprinting away. (Gov't Ex. 3 at 10:42.) Ali takes three-to-four strides and moves past the rear of the squad car before Jama is able to grab hold of Ali and stop him from running any further. (Gov't Ex. 2 at 10:42; Gov't Ex. 3 at 10:45.) At this point, Jama arrested Ali and searched the vehicle, starting in the front passenger compartment where Ali had been sitting, where he saw "a black handgun with a silver switch on it." (Tr. 41–43.) After his search of the car, Jama allowed the driver

2

and rear-seat passenger to return to the car and leave the scene. (*Id.* at 50–51.) Ali was ultimately charged with one count of unlawful possession of a machinegun in violation of 18 U.S.C. §§ 922(o)(1) and 924(a)(2).

Ali filed multiple motions, including a Motion to Dismiss Indictment (Doc. No. 25) and Motion to Suppress Fruits of Unlawful Arrest and Search and Seizure (Doc. No. 31). The R&R recommended denying both Motions. (Doc. No. 52.) Ali filed an Objection to the part of the R&R recommending denial of the Motion to Suppress; Ali did not object to the part of the R&R recommending denial of the Motion to Dismiss. (*See* Doc. No. 53.)

## DISCUSSION

Ali objects to the Magistrate Judge's recommended conclusions that law enforcement officers had reasonable suspicion to expand the scope of the traffic stop and probable cause to search the vehicle. This Court reviews de novo any portion of an R&R to which specific objections are made. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3); D. Minn. L.R. 72.2(b)(3). After conducting a de novo review, the Court adopts the recommendation and concludes that the expansion of the traffic stop was supported by reasonable suspicion and the warrantless search of the vehicle was supported by probable cause. (Doc. No. 53.)[1]

**I.  REASONABLE SUSPICION TO EXPAND SCOPE OF TRAFFIC STOP**

---

[1] The Magistrate Judge also determined that a concern for officer safety separately justified conducting a protective sweep of the vehicle. (R&R at 15–17.) Given the Court's decision that officers had probable cause to believe that the vehicle contained evidence of a crime, the Court need not determine address this separate basis to deny Ali's suppression motion.

3

Because of the observations the officers made about Ali's conduct and the driver's hesitation when asked if there were weapons in the vehicle, the Court concludes that the officers had reasonable suspicion to expand the scope of the traffic stop.

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. The exclusionary rule "forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009). "[T]his judicially created rule is designed to safeguard Fourth Amendment rights generally through its deterrent effect." *Id.* at 139–40 (quotation omitted).

The permissible duration of police inquiries in the traffic-stop context is determined by the seizure's mission: to address the traffic violation that warranted the stop, and to attend to related safety concerns. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citations omitted). "Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose." *Id.* (citation modified). That said, "the government's officer safety interest stems from the mission of the stop itself." *Id.* at 356. "Traffic stops are especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Id.* at 356 (quotation omitted). Additionally, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). Furthermore, "when there is more than one occupant in a vehicle, the possible sources of harm to the officer are increased." *United States v. Sanders*, 510 F.3d 788, 790 (8th Cir.

4

2007) (quotation omitted). During a traffic stop, an officer may complete routine tasks, including "asking a passenger for identification and running a computer check if the passenger consents to the request for identification." *United States v. Ward*, 140 F.4th 945, 951 (8th Cir. 2025) (quotation omitted).

Here, Jama approached the car and asked the driver for his identification (ID) (Gov't Ex. 2 at 0:57); after reviewing the driver's ID, Jama asked the passengers for their IDs (*id.* at 1:20). Three seconds later—and twenty-six seconds since he first approached the car—Jama asked if there were "any weapons in the car." (*Id.* at 1:23.) These questions were negligibly burdensome precautions to secure officers' safety. (*See* Tr. 94 ("Q. Why would you ask [if there was a firearm] in a vehicle stop? A. Just for safety for both myself and the individual is why we ask those questions.").) All of these questions lasted fewer than thirty seconds—they did not "measurably extend" the stop. *Johnson*, 555 U.S. at 333. Ali cites no law that suggests that officers must address the traffic infraction before they may ask questions related to safety concerns.

Furthermore, the car occupants' unusual response to Jama's question about weapons constituted a complication that justified extending the traffic stop after that point. *Cf. Ward*, 140 F.4th at 951 ("[A] lawful detention may be prolonged for a reasonable time without violating the Fourth Amendment if complications arise while checking identification."). Jama noted that the car occupants were "hesitating" before answering "no" to his question about whether there were weapons in the car. (Gov't Ex. 2 at 1:30; *see also* Tr. 31.) Jama testified that he has asked this same question at "300 or more stops" during his career, and that it usually takes no time to get an answer. (Tr. 31.) Jama also

5

noted that Ali was looking down at the floorboard and moving a pair of shoes as Jama was asking the car occupants about whether there were weapons in the car. (*Id.* at 32, 35.) The fact that the car occupants hesitated suggested to Jama that there were "possibly firearms inside the vehicle." (*Id.* at 32.) Similarly, the fact that Ali was "moving his legs back and forth with those shoes" and looking down at the floor concerned Jama because he believed that Ali might have been concealing firearms under his seat. (*Id.* at 35–36.) Given Jama's experience that people usually do not hesitate when answering whether there are any weapons in the vehicle, the car occupants' hesitation here—noticed and commented on contemporaneously by both officers—constitutes unusual or extreme nervousness, which when combined with Ali's actions, establish reasonable suspicion to expand the traffic stop. *See, e.g.*, *United States v. Pacheco*, 996 F.3d 508, 513 (8th Cir. 2021) (distinguishing *United States v. Beck*, 140 F.3d 1129, 1139 (8th Cir. 1998), and concluding that "*Beck*'s holding does not foreclose relying on a defendant's unusual or extreme nervousness to find reasonable suspicion").

## II.   PROBABLE CAUSE TO SEARCH THE VEHICLE

Because the driver provided a second answer concerning the presence of guns that conflicted with the first, and because Ali attempted to flee when being escorted to the squad car, the Court concludes that the officers had probable cause to conduct a warrantless search of the vehicle.

Law enforcement officers must have probable cause to search a vehicle without a warrant. *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007). Probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found

6

in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "In determining whether an officer had probable cause to search, courts apply a common sense approach and consider all relevant circumstances." *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005).

Here, various circumstances support a finding of probable cause to search the vehicle. As noted above, the car occupants hesitated to answer Jama's question about whether there were weapons in the car before answering "no." (Gov't Ex. 2 at 1:30; Tr. 31.) After answering "no," the driver was subsequently asked a slightly more specific question and provided a conflicting answer. (Tr. 38.) In contrast to answering in the negative when asked about weapons in the car, when Jama asked the driver specifically about the presence of guns, the driver subsequently stated, "I don't know." (*Id.*) In addition, also as discussed above, while Jama was questioning the car occupants, Ali was looking at the floorboard and moving a pair of shoes around the floor, which made Jama suspect that weapons were concealed under the seat. (*Id.* at 35–36.) Finally, and perhaps most importantly, when Jama was escorting Ali to the squad car, Ali began sprinting away from the vehicle and from Jama. (*Id.* at 40; Gov't Ex. 2 at 10:42; Gov't Ex. 3 at 10:43.) Based on all of these circumstances, Jama had probable cause to believe that the vehicle contained evidence of criminal activity.

### III.   MOTION TO DISMISS INDICTMENT

Neither party objected to the portion of the R&R recommending denial of Ali's Motion to Dismiss (R&R at 21–22). Even though it may not be subject to this standard of review in light of Ali's failure to object, after reviewing the Magistrate Judge's

recommended disposition de novo, the Court agrees with the Magistrate Judge's analysis and adopts the recommendation to deny this Motion.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendant Amiir Mawlid Ali's Objections to the Report and Recommendation (Doc. No. 53) are OVERRULED.

2. The Report and Recommendation (Doc. No. 52) is ADOPTED.

3. Defendant Amiir Mawlid Ali's Motion to Suppress Fruits of Unlawful Arrest and Search and Seizure (Doc. No. 31) is DENIED.

4. Defendant Amiir Mawlid Ali's Motion to Dismiss Indictment (Doc. No. 25) is DENIED.

Dated: December 24, 2025                /s/ *Jeffrey M. Bryan*
                                        Judge Jeffrey M. Bryan
                                        United States District Court